## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIPBUILDERS, BLACKSMITHS, FORGERS & HELPERS, AFL–CIO, Respondent.

· No. 77–1850.

United States Court of Appeals, Fifth Circuit.

Oct. 5, 1978.

Vance, Circuit Judge, filed a dissenting opinion.

---

Before HILL, RUBIN and VANCE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order [1] against a union for violating Section 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A); the union removed one of its members from his position as area steward because he filed an unfair labor practice charge against his employer without first pursuing the grievance procedure required by the union's contract, as he was urged to do by the union's leadership. Because the union policy to which the member, Perry Soape, refused to adhere reflected a legitimate union interest in harmony with our national labor policy, we hold that the union's action in removing him from an appointive union office is not the type of constraint on a union member's actions intended to be proscribed by Section 8(b)(1)(A) of the Act. Consequently, we deny enforcement.

I.

Mr. Soape had been employed by General American Transportation Corporation as a boilermaker chipper until November, 1974. He contended that his termination was an unfair labor practice, and filed a charge with the Board alleging that the company had violated Sections 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3).

Mr. Soape was hired by the company at a different location in December, 1974. He had been acting as area steward since January, 1974 and continued to do so in his new position.

Union officials repeatedly requested that Soape withdraw his charge with the Board and instead follow the grievance procedures under its collective bargaining agreement.

Elliott Moore, Deputy Assoc. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, Alan Banov, Atty., N.L.R.B., Washington, D. C., for petitioner.

John J. Blake, Stanley L. Basler, Kansas City, Kan., for respondent.

1. Reported at 227 N.L.R.B. 1695.

They warned him that he would be making an enemy of the union if he refused.

When Soape did refuse, the union notified the company that it was removing him from his position as area steward. By letter dated February 19, 1975, the company informed him that it had received the union's notification, and, accordingly, that he could no longer leave the work site to attend to union business. Soape denied receiving the company's letter, but he saw it posted on a company bulletin board on February 24. When he insisted on leaving the job site that day to seek verification from the union that he had been removed, the company discharged him for leaving work without permission. As far as the record shows, Soape had no actual notice of the union's decision to remove him as area steward prior to that morning.

On the basis of additional charges filed by Mr. Soape, a consolidated complaint was issued against both the company and the union. The company was charged with violating Sections 8(a)(1), (3) and (4), 29 U.S.C. § 158(a)(1), (3) and (4), of the Act as amended, by terminating Soape, and by refusing to reinstate him because he engaged in union activities "and/or" because he had previously filed an unfair labor practice charge against the company. The union was charged with violating Section 8(b)(1)(A) of the Act by relieving Soape of his position as area steward because he had filed the prior charge against the company directly with the Board.

The case before us involves only the Board's finding that the union violated Section 8(b)(1)(A) of the Act.

**2.** Section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A) makes it an unfair labor practice for a union or its agents:

    (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in [Section 7]: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or *retention of membership* therein; . . .

The essential complaint in Soape's original charge was that he was dismissed by his employer because of his union activities. Section 7 of the Act, 29 U.S.C. § 157, guarantees to employees:

## II.

The union challenges the Board's findings of fact on the basis that there is insufficient evidence that Soape ever held a position known as area steward, or that the union took action with respect to Soape because he filed charges with the Board. These factual determinations are, however, supported by substantial evidence on the record as a whole. They are, therefore, conclusive. *Universal Camera Corp. v. NLRB,* 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; *Mueller Brass Co. v. NLRB,* 5 Cir. 1977, 544 F.2d 815.

## III.

We are thus left to consider whether the union's removal of Soape from his position as steward violated the Act. Conceding, *arguendo,* that the union's conduct might be held violative of the Act under a literal reading of Section 8(b)(1)(A),[2] we adhere to the Supreme Court's holding that this section must be construed in accordance with the objective Congress sought to achieve and not merely by mechanical application of its precise words:

> Congressional meaning is of course ordinarily to be discerned in the words Congress uses. But when the literal application of the imprecise words "restrain and coerce" Congress employed in § 8(b)(1)(A) produces . . . extraordinary results . . . we should determine whether this meaning is confirmed in the legislative history of the section.

*NLRB v. Allis-Chalmers Manufacturing Co.,* 1967, 388 U.S. 175, 184, 87 S.Ct. 2001,

> The right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ..

Soape's original charge to the Board was thus an *attempt to enforce his rights under Section 7.* Read literally, Section 8(b)(1)(A) might thus be construed to prohibit any action by the union that constrains employees in the exercise of Section 7 rights by discouraging resort to Board enforcement proceedings.

2008, 18 L.Ed.2d 1123, 1130. *Allis-Chalmers* establishes the existence of a realm of union affairs in which discipline that constrains the behavior of union members is permissible, notwithstanding a potential conflict between such restraint and the wording of Section 8(b)(1)(A).

The limits of permissible union self-regulation were drawn in *NLRB v. Industrial Union of Marine & Shipbuilding Workers of America*, 1968, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706. In the *Marine Workers* case, the Court held that a union could not dismiss from membership a member who violated a union rule that required him to exhaust intra-union remedies for grievances against the union before resorting to tribunals outside the union for relief. The union rule, the Court held, was contrary to the need for such free access to the Board as is necessary to effectuate the public policies that the Board is empowered to enforce:

> Any coercion used to discourage, retard, or defeat that access is beyond the legitimate interests of a labor organization. . . . [T]he overriding public interest makes unimpeded access to the Board the only healthy alternative, *except and unless plainly internal affairs of the union are involved.*

(Emphasis supplied.) *Id.*, 391 U.S. at 424, 88 S.Ct. at 1722, 20 L.Ed.2d at 712. To the extent the sanction imposed by the union discourages or retards access to the Board, that penalty and the policy underlying it are impermissible "except and unless plainly internal affairs of the union are involved."

■ In this case, however, the union's discharge of Soape as its representative, without further retribution of any kind, falls within the scope of permissible self-regulation as delineated by *Marine Workers*. The maintenance of cohesive leadership in a union that functions as the employees' exclusive bargaining representative is a legitimate union interest and a "plainly internal affair." It is no less "internal" because the policy sought to be enforced is embodied in a collective bargaining agreement rather than in a union's constitution or by-laws; as *Allis-Chalmers* and *Marine Workers* show, the existence of a union rule embodying the union leadership's policy position is not determinative of whether the matter in dispute is "plainly internal." It is essential only that the leadership's position be fairly representative of the union, consistent with national policy, and not arbitrary. A contractual grievance procedure of the kind invoked by the Boilermakers here has been referred to by the Supreme Court as a "major factor in achieving industrial peace" through collective bargaining, itself the cornerstone of our federal labor policy. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 1960, 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409, 1414–1415.

Unlike the Marine Workers' union leadership, the Boilermakers' leadership was trying to discourage disregard of this process by its own spokesman. Whether the union policy sought to be enforced is embodied in a contract approved by the membership or in a union rule similarly adopted, the relevant questions for a reviewing court are whether that policy is consistent with the national labor policy, and whether the means of enforcement chosen reflects concerns that are "plainly internal" affairs.

■ Soape's initial decision to lodge a complaint against the employer and not against the union does not alter the result. Although the latter case is not before us, the discharge of a union officer for filing a charge against his *union* might be a less "plainly internal affair" than the present case because we might be less able in that case to conclude confidently that the union's disciplinary interest was in cohesive leadership rather than in using that pretext to cloak a device to prevent effective relief for intra-union grievances. An attempt thus to impair members' rights would implicate considerations of public policy that would take the enforcement of the intra-union exhaustion-of-remedies requirement wholly outside the realm of permissible self-

regulation.[3] As we construe *Marine Workers*, a union's right to self-regulation extends to membership-approved rules and policies consistent with federal labor policy that are enforced by union sanctions chosen to further "plainly internal" union concerns.[4] *See also Scofield v. NLRB*, 1969, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385.

Soape was not, in fact, denied access to the Board. He has pressed his charge against his employer, thus far unsuccessfully. No pecuniary penalty, nor any sanction affecting his membership status, was imposed by the union; as a union *member*, he could not lawfully have been discouraged by such sanctions from initial resort to the Board, notwithstanding the union's legitimate interest in encouraging adherence to contractual procedures.[5]. However, upon assuming union office, Soape undertook duties also to carry out and further union policies and to help assure its success as a collective bargaining agent. The union's management, having concluded that the union's credibility as a bargaining agent would be furthered by its officials' adherence to negotiated processes—a rational conclusion that is consistent with the national labor policy—the union's leaders could reasonably expect its representatives' loyalty and support in pursuit of that policy. Soape's discharge for defiance of the leadership reflected the legitimate internal concerns of any functioning enterprise.

Our conclusion in this case squares with those cases that hold a union *officer* may be dismissed for expressing defiance of union policies, notwithstanding the provisions of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(2), guaranteeing to labor union *members* the right of free speech. The law of this circuit distinguishes between discharge from office, which is permissible, *Wambles v. International Brotherhood of Teamsters*, 5 Cir. 1974, 488 F.2d 888, accord, *Newman v. Local 1101, Communications Workers of America*, 2 Cir. 1978, 570 F.2d 439, *see also Doe v. AFL–CIO, Dep't of Organization, etc.*, N.D.Ga.1975, 405 F.Supp. 389, and sanctions affecting membership status, which are not, *Fulton Lodge No. 2 of International Association of Machinists v. Nix*, 5 Cir. 1969, 415 F.2d 212, *cert. denied*, 1972, 406 U.S. 946, 92 S.Ct. 2044, 32 L.Ed.2d 332. As we recognized in *Sewell v. Grand Lodge of International Association of Machinists*, 5 Cir. 1971, 445 F.2d 545, 550–551, *cert. denied*, 1972, 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674:

> . . . [E]ach member of a labor union is guaranteed the right of free expression as well as the right to participate freely in the union's democratic processes. Disciplinary action for the exercise of such rights offends the terms of the Labor Management Reporting and Disclosure Act. . . . This conclusion, however, does not permit an employee who accepts employment for the performance of certain specified duties to take the largesse and pay of the union, on the one hand, and, on the other, to completely subvert the purposes of his employment by engaging in activities diametrically opposed to the performance of his specified duties. As Judge Bell observed in *Airline Maintenance Lodge 702, etc. v. Loudermilk*, 5 Cir. 1971, 444 F.2d 719, 723:

**3.** The bare existence of a colorable unfair labor practice charge predicated on an asserted violation of statutory rights cannot be construed as determining that a case of union discipline is not a "plainly internal matter." If it could, the proviso written by the Supreme Court in the *Allis-Chalmers* case, *supra*, would be no exception at all.

**4.** As the Court analyzed the legislative history of Section 8(b)(1)(A) in the *Allis-Chalmers* case, *supra*, Congress's primary concern was the proscription of coercion aimed at non-union

> employees during organizational campaigns that would restrain them in the exercise of their right not to join in a labor organization for collective bargaining. 388 U.S. at 186–189, 87 S.Ct. at 2009–2011, 18 L.Ed.2d at 1131–1132. No such coercion is involved in this case.

**5.** The record in no way indicates that the union's discharge of Soape as an officer in any way discouraged or was intended to discourage any union *member* from initial resort to the Board with respect to an unfair labor practice charge.

The rights of a union member under this statute must be balanced against the right preserved to the union to make rules as to the responsibility of the member toward the union as an institution. And this balancing process must rest on the facts.

To permit an individual to accept union employment, to receive union pay, and to enjoy the prestige of a union position, while spending his employer's time opposing the plans and policies he was employed to execute, would in our judgment, be unreasonable. All employees, whether they work for a union or a large commercial company, may be required at times to subordinate personal expression to the responsibilities of their employment. An essential and elemental ingredient of all employment is basic loyalty by employees to the employer in performing the duties of the job for which they were hired.

\* \* \* \* \* \*

To hold that a union has no right to discharge an employee for insubordination under the facts of his case would, we believe, seriously detract from effective, cohesive union leadership.

(Footnotes omitted.) [6]

The rationale of the LMRDA cases applies *a fortiori* to this case. Individual constitutional rights are not at stake here; no balancing of First Amendment interests is involved. Neither is this a case in which a union officer is being penalized for compliance with a legal duty, such as testifying before the NLRB in an already-initiated action, *cf. Oil City Brass Works v. NLRB*, 5 Cir. 1966, 357 F.2d 466. There is no evidence that the union is trying to regulate access to effective enforcement of employee rights, or that the contractual grievance procedures were being discriminatorily enforced or would have been ineffectual.

Viewing this case, as we must, on its facts, it does not appear that the discharge of Soape from his position as area steward

constitutes "restraint or coercion" as contemplated by the Act. Consequently, the Board's petition for enforcement of its order is DENIED.

VANCE, Circuit Judge, dissenting:

Resolution of the question before the court requires that the rationale of two Supreme Court cases be extended into an overlapping gray area. The question is a close one. The guideposts which lead to our point of departure, however, point me to a result different from that reached by the majority.

The central question involves a clash between the respondent union's right to control its internal affairs and the right of an individual, who happens to be a union officer, to have unimpeded access to the National Labor Relations Board (the "board") in connection with his individual employment status. The union argued before this court that it did not coerce or restrain the employee in any way forbidden by the National Labor Relations Act (the "Act"), but that it merely exercised its right to govern its internal affairs, or more specifically the actions of its officers. The union placed primary reliance on *NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). The question presented in the *Allis-Chalmers* case as stated by the court was:

[W]hether a union which threatened and imposed fines, and brought suit for their collection, against members who crossed the union's picket line and went to work during an authorized strike against their employer, committed the unfair labor practice under § 8(b)(1)(A) of the National Labor Relations Act of engaging in conduct 'to restrain or coerce' employees in the exercise of their right guaranteed by § 7 to 'refrain from' concerted activities. *Id.* at 176, 87 S.Ct. at 2004.

The Supreme Court held that section 8(b)(1)(A) does not prevent a union from

---

**6.** Former NLRB Chairman Murphy dissented from the Board's disposition of this case on grounds essentially the same as the analysis now adopted by this Court. 227 N.L.R.B. at 1696.

imposing fines on members who cross a picket line set up to implement an authorized strike. The strike, "is the ultimate weapon in labor's arsenal for achieving agreement upon its terms . . . ." *Id.* at 181, 87 S.Ct. at 2007, and "[t]he power to fine or expel strikebreakers is essential if the union is to be an effective bargaining agent. . . ." *Id.*

The union's freedom of self regulation was protected in *Allis-Chalmers* in a situation where its legitimate internal affairs were concerned. Subsequent cases demonstrate, however, that the internal affairs exemption in section 8(b)(1)(A) is not applicable when a question outside the legitimate internal affairs of the union is raised or where its application would be contrary to national labor policy.

In *NLRB v. Industrial Union of Marine and Shipbuilding Workers*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968), a union member who had a grievance against his local's president for violating the international constitution was expelled for filing a charge against the local with the board without first exhausting remedies available within the union. The Supreme Court recognized that considerations of public policy different from those presented in *Allis-Chalmers* had come into play. It had previously noted that the board could not initiate its own proceedings. The force and effect of the Act is dependent upon the initiative of individual persons. *Nash v. Florida Indus-*

*trial Commission*, 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967). The policy of keeping people completely free from coercion in connection with access to the board was recognized as being important in the functioning of the Act as an organic whole. The provision in the international constitution under which the union member was disciplined in *Marine Workers* was viewed as contrary to that policy, the court stating:

> Any coercion used to discourage, retard, or defeat that access [to the board] is beyond the legitimate interests of a labor organization. *Id.* 391 U.S. at 424, 88 S.Ct. at 1722.

In upholding the board's remedial order in favor of the employee, the court held:

> [T]he proviso in § 8(b)(1)(A) that unions may design their own rules respecting 'the acquisition or retention of membership' is not so broad as to give the union power to penalize a member who invokes the protection of the Act for a matter that is in the public domain and beyond the internal affairs of the union. *Id.* at 425, 88 S.Ct. at 1722.

The Supreme Court's opinion in *Marine Workers* followed the policy of the board as previously expressed in the so-called *Skura* case.[1] *Local 138, International Union of Operating Engineers*, 148 N.L.R.B. 679 (1964). It expresses that there should be as much freedom to seek relief from the board as to petition any other agency of govern-

---

1. The board in *Local 138, International Union of Operating Engineers*, 148 N.L.R.B. 679 (1964) (The "*Skura*" case), rejected a similar argument by the union, stating in part:

> Section 10 of the Act grants to the Board exclusive authority to prevent and remedy unfair labor practices, and, in furtherance of the exercise of the Board's authority, confers upon any person the right to file an unfair labor practice charge.[6] The right to file

> [6] Also see, the National Labor Relations Board, Rules and Regulations Series 8, as amended, Section 102.9.

> charges is indispensable to the administration of the Act since the Board cannot initiate its own processes and no unfair labor practice complaint can issue in the absence of a valid charge.[7]

[7] *Hercules Powder Co. v. N. L. R. B.*, 297 F.2d 424, 433 (C.A.5).

\* \* \* \* \* \*

> Just as an employer violates the Act by resorting to restraint and coercion to restrict the rights of an employee to file a charge, so too, does a labor organization infringe the rights of employees under this law by resorting to unlawful means to prevent or restrict employees from filing charges. As such conduct by an employer violates Section 8(a)(1), so does a labor organization's use of restraint or coercion violate Section 8(b)(1)(A).[10]

[10] *International Ladies Garment Workers' Union, AFL–CIO (Bernhard-Altmann) v. N. L. R. B.*, 366 U.S. 731, 737–738, 81 S.Ct. 1603, 6 L.Ed.2d 762.

ment for redress of grievances.[2] The overriding public interest requires unimpeded access to the board except and unless plainly internal affairs of the union are involved.[3]

The majority distinguishes *Marine Workers* based on its conclusion that removal of this union officer from his position is not similar to other punishments since his action in failing to follow the grievance procedure undermines the union's strength as a bargaining agent.

Under the 8(b)(1)(A) proviso, a union is free to enforce a properly adopted rule to the extent that it reflects legitimate union interests and "impairs no policy Congress has imbedded in the labor laws." *Scofield v. NLRB*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969). The impeding of free access to the board in connection with a charge against an employer is contrary to the plain policy of the Act. *Marine Workers* teaches that an internal union rule which thus frustrates an overriding policy of national labor law may not be enforced under the exemption. In my view interfering with Mr. Soape's access to present a charge against his employer is therefore outside the legitimate interests of the union and wholly beyond the scope of the 8(b)(1)(A) proviso.

The LMRDA free speech cases cited by the majority[4] are also the product of a balancing of conflicting rights. Although distinguishable, they obviously are of persuasive effect when somewhat similar balancing processes are required in other areas.

Also of persuasive force, however, is the line of cases from the board holding that removal of a union official from office for filing a charge with the board constitutes an unfair labor practice under 8(b)(1)(A). *Meat Cutters Local 590*, 181 N.L.R.B. 773 (1970); *Clothing Workers Local 424*, 193 N.L.R.B. 390 (1971); *cf., Tool and Die Makers Lodge 113*, 207 N.L.R.B. 795.

The disparity of result between the LMRDA cases and the N.L.R.B authorities is not explained by factual distinctions; nor do I view it as necessarily presenting a conflict. It is, I believe, correctly explained by a difference in the underlying policies being given effect in the two different situations.

The applicable provisions of LMRDA were designed to protect the member's right to discuss freely and to criticize the management of his union and the conduct of union officers. The free speech right belongs to each union member, as a member, regardless of any additional status he may attain. The union cannot infringe upon his right *as a union member.* This is not to say, however, that the same provisions protect *a union officer* if after assuming his office he embarks on a course of subverting the union's leadership and vocally attacking its policies. According to the prevailing view in this circuit, affording protection in this latter situation was simply not part of the congressional purpose. Cases that adopt this view generally recognize that judicially implanting such uncon-

---

**2.** *See* Cox, *Internal Affairs of Labor Unions under the Labor Reform Act of 1959,* 58 Mich. L.Rev. 819, 839 (1960); Summers, *Legal Limitations in Union Discipline,* 64 Harv.L.Rev. 1049, 1067–1068 (1951); Summers, *The Usefulness of Law in Achieving Union Democracy,* 48 Am.Econ.Rev. 44, 47 (1958).

**3.** Illustrative of the opinions from other courts of appeal which turn on the same principles are: *Roberts v. NLRB,* 350 F.2d 427 (D.C.Cir. 1965); *NLRB v. International Union of Operating Engineers, Local 825,* 420 F.2d 961 (3d Cir. 1970); *NLRB v. Local 30, International Long-*

*shoremen's and Warehousemen's Union,* 549 F.2d 698 (9th Cir. 1977).

**4.** There is a conflict among the circuits. *See e. g., Bradford v. Textile Workers, Local 1093,* 563 F.2d 1138 (4th Cir. 1977) holding that "removal from union office for an exercise of free speech by a union member is 'discipline' which is proscribed by § 609 of the Act . . .."

The *Newman* rule and the apparent rule in this circuit are characterized as the minority view in *Bradford, id. See also Wood v. Dennis,* 489 F.2d 849 (7th Cir. 1973).

templated protection of dissident officials would fragment and unnecessarily weaken unions.

In contrast, the policy of the law with respect to board access is not directly related to an individual's status. As was pointed out in *Marine Workers, supra*:

> A proceeding by the Board is not to adjudicate private rights but to effectuate a public policy. . . . The policy of keeping people 'completely free from coercion' *ibid*, against making complaints to the Board is therefore important in the functioning of the Act as an organic whole. *Id.* 391 U.S. at 424, 88 S.Ct. at 1721.

The breadth of the policy is accurately reflected in *Skura, supra*, as follows:

> Considering the overriding public interest involved, it is our opinion that no private organization should be permitted to prevent or regulate access to the Board, and a rule requiring exhaustion of internal union remedies by means of which a union seeks to prevent or limit access to the Board's processes is beyond the lawful competency of a labor organization to enforce by coercive means. *Id.* at 682.

As I perceive the policy being described, protection from coercion extends to all people regardless of union status.

The facts before us do not involve any attack by Mr. Soape on the union, its leadership or its officers. A charge by an employee against his own employer and arising out of his own discharge is manifestly less involved in internal union affairs than is a charge by a member against his union or its officers.[5] This is the implication of the dictum in *Scofield v. NLRB, supra*:

> Frustrating this policy [of free access to the board] was beyond the legitimate interest of the labor organization, at least where the member's complaint concerned conduct of the employer as well as the union. *Id.* 394 U.S. at 430, 89 S.Ct. at 1158.

Soape offended his union by filing a charge as an employee against his employer, when for unstated but understandable reasons, the union preferred that he pursue contract grievance procedures. This is not what *Marine Workers* refers to as a "plainly internal affair of the union." Although Soape might have been provided relief if he had elected to pursue the contract grievance procedure, the union's internal procedures could not provide him with any relief whatever. More importantly, the question is clearly "in the public domain" and for that reason is beyond the internal affairs of the union.

I focus not so directly on the invasion of Mr. Soape's rights as on prevention of any coercive action of any type directed toward any person and designed to impede access to the board. Removal from a position of union leadership is "a most effective weapon of reprisal." *Grand Lodge of International Association of Machinists v. King*, 335 F.2d 340, 345 (9th Cir. 1964), *cert. denied*, 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964). The form of the coercion, however, is not determinative. It is the policy of the law that there be no coercion. Against this backdrop, I would conclude that the action of the union was violative of section 8(b)(1)(A) and that the board's order should be enforced.

---

5. Although I doubt that this fact is controlling, I would reserve the question as to whether the balance might be struck differently under extreme circumstances involving a wholly internal union matter.