**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CARPENTERS LOCAL UNION NO. 35, Respondent.**

No. 83–7424.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 14, 1984.

Decided Aug. 3, 1984.

**480**

Ellen Farrell, Washington, D.C., for petitioner.

Michael B. Roger, Van Bourg, Allen, Weinberg & Roger, Alan B. Exelrod, San Francisco, Cal., for respondent.

Before DUNIWAY, ANDERSON and SKOPIL, Circuit Judges.

SKOPIL, Circuit Judge:

The National Labor Relations Board ("Board") petitions for enforcement of its order finding that Carpenters Union Local 35 ("Union") violated section 8(a)(1), 29 U.S.C. § 158(a)(1), by unlawfully discharging two employees. Substantial evidence in the record supports the Board's findings. The Board correctly applied the law. Accordingly, we will enforce the Board's order.

## FACTS AND PROCEEDINGS BELOW

Klaus Martin and William Prescott are members of the Union. Additionally, they were employed by the Union as assistant business representatives and/or organizers. They were also elected to the Union's Executive Board. Martin was a trustee and Prescott was "conductor".

As a trustee, Martin was responsible along with others for supervising Union funds. In the course of such duties, Martin became concerned about the Union's handling of certain monies. Martin sought to (1) change auditing firms, (2) prevent the payment of retired members' dues from Union funds, and (3) reinvest strike funds into higher interest bearing accounts. Martin also challenged an apparent unau-

thorized expense reimbursement and the handling of a donation which was allegedly deposited into an incorrect account.

Martin raised these issues at regular Union membership meetings and at Executive Board meetings. His allegations were often disputed by the Financial Secretary. Martin requested a credit check on the Financial Secretary's personal business dealings to determine if there existed any basis for conflict of interest. The investigation uncovered no conflict and the Financial Secretary became "very irate" when the bill for the investigation was submitted to the Union.

Martin and Prescott also contacted the Department of Labor ("DOL") to complain about Union affairs. They alleged that irregularities occurred in the election nominating process, that members not in good standing in the Union would be allowed to vote in the upcoming election, and that the Union had mishandled various funds. The DOL told Martin and Prescott to first exhaust Union remedies and to further substantiate their allegations of fund misuse. Consequently, over the next few months, Martin and, from time to time, Prescott and other Union members met with DOL representatives to review the financial allegations.

When elections were held, the Financial Secretary was reelected and Martin was defeated in his bid for reelection. Prescott was declared ineligible for office because of delinquent dues. Following the election Martin, Prescott and others filed election protests. They submitted their allegations to the International Union which eventually denied the challenges. Thereafter, the protesting members filed a complaint with the DOL alleging election violations and misuse of funds.

When Prescott requested that his Union employment be extended, the Executive Board voted not to renew it. At the same meeting, Martin's indeterminate term was changed to a fixed term.

At the next regular membership meeting the election protest letter to the International was read aloud. Martin, Prescott and the others who signed the letter were characterized as "troublemakers". At a later membership meeting, the Financial Secretary moved that Martin be discharged from his employment with the Union. The Financial Secretary cited to the many "problems" that Martin had caused, specifically noting Martin's investigation of the Secretary's personal finances. The Union's Business Agent also spoke in favor of the discharge, pointing out that, because of Martin and others, the government was "coming into the offices" the next day for an investigation. The membership thereupon terminated Martin's employment. The following day the Business Agent told Martin that he was fired "for going to the government and for investigating [the Financial Secretary]". Martin received a termination letter from the Union stating that the cause of discharge was "for conduct unbecoming an officer". Later, the Financial Secretary told another Union member that Martin and Prescott were fired because they had filed charges with the DOL.

Based on these events, the Union was charged with committing an unfair labor practice. An ALJ found, however, even assuming both were discharged for the described activities, that no unfair labor practice occurred because the employees' activities, while "concerted", were not "for the purpose of collective bargaining or other mutual aid or protection."

A divided Board disagreed, holding that the activities were protected and that the Union, acting as an employer, violated section 8(a)(1) of the Act by discharging Martin and Prescott. The Board seeks enforcement of its order requiring that the Union cease and desist from the unfair labor practice and reinstate Prescott with back pay. Martin has settled with the Union concerning any reinstatement and back pay awards.

## DISCUSSION

### A. Standard of Review

We will enforce the Board's order if the Board's findings of fact are sup-

ported by substantial evidence in the record and if the Board correctly applied the law. *NLRB v. Nevis Industries Inc.*, 647 F.2d 905, 908 (9th Cir.1981). The Board's interpretation of the Act is entitled to deference, and will be upheld if reasonably defensible. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).

### B. Substantial Evidence .

■ The Union argues that Prescott and Martin would have been terminated notwithstanding their alleged protected activities. The Union asserts that the decision to not reemploy Prescott was made before the alleged activities. The record shows, however, that Prescott's request for an extension was denied in the midst of the controversy. Additionally, the Union argues that Prescott's services were no longer needed. The unrefuted evidence shows that Prescott was working 80 hour weeks. We agree with the ALJ that the Union's claimed "good cause" reason for discharging Prescott was a "mere pretext".

■ The Union suggests that Martin was terminated before the expiration date of his term because he was disabled. The Financial Secretary noted Martin's disability in support of his motion to the membership to terminate Martin's employment, and later remarked to another Union member that Martin was "unable to perform his job." But, there is substantial evidence that Martin was terminated for complaining to the DOL. Martin was referred to as a "troublemaker." Union officers told him and others that the discharge was made because he went to the government and filed charges. Finally, the minutes of the meeting in which the membership voted to discharge Martin note that he was terminated "not because of his disability but for misconduct as an employee and an officer."

■ The Union further argues that the Board erred in not properly applying the mixed motive analysis of *Wright Line*, 251 NLRB 1083, *enf'd*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). But, the

Board found that Martin and Prescott were discharged solely for engaging in the described activities and accordingly the mixed motive analysis of *Wright Line* need not be applied. We find adequate support in the record for that conclusion. Union officials stated that the two were discharged for their complaints to the DOL and for their investigative activities. There is no evidence to suggest that the two failed to perform their respective jobs. Accordingly, we find sufficient evidence in the record to support the Board's findings that the two were discharged for engaging in the described activities.

### C. Protected Activity

The Union argues that the discharges were not unlawful because the activities at issue are not protected by the Act. Section 8(a)(1) makes it an unfair labor practice for any employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in section 7. Section 7 provides that employees "shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ...." 29 U.S.C. § 157.

Martin and Prescott were not seeking to organize, to form or to join a labor organization in their capacity as Union employees. *See, e.g., Retail Clerks International Association v. NLRB*, 366 F.2d 642 (D.C. Cir.1966) (unfair labor practice for union to refuse to bargain with its organized employees). Instead the Board found that Martin and Prescott were engaged in intra-union activity, "acting in their capacity as Union members," by seeking assistance from the DOL for alleged election and fund irregularities. The Board argues that by invoking such processes, Martin and Prescott "were expressing their concerns as members and elected officers of the Union and taking action of the sort that was reasonably likely to benefit both themselves and their fellow carpenters." The

two were engaged in concerted activity for the purpose of "mutual aid or protection" because, as the Board argues, they were attempting to "protect the integrity of their collective bargaining representative."

■ Activities for "mutual aid or protection" within the meaning of section 7 are not limited to either the employer-employee relationship or to activities intended to change terms or conditions of employment. *E.g., NLRB v. Southern California Edison Co.,* 646 F.2d 1352, 1364 (9th Cir. 1981) (sympathy strike); *Kaiser Engineers v. NLRB,* 538 F.2d 1379, 1385 (9th Cir.1976) (employee political lobbying). Attempts by employees to bring about changes in their union's performance as their collective bargaining representative are protected by section 7. *NLRB v. Transcon Lines,* 599 F.2d 719, 721 (5th Cir.1979).

■ The Union relies on *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982). There the Court held that the discharge of a union's appointed business agents by the newly elected union president did not violate sections 101(a)(1) and (2), 29 U.S.C. §§ 411(a)(1) and (2), of the Labor-Management Reporting and Disclosure Act (LMRDA). The Court reasoned that the LMRDA was intended to protect only rank-and-file union membership and not job security or tenure of union employees. *Id.* at 436–37, 102 S.Ct. at 1870–71. Thus, the Union's discharge of Martin and Prescott does not violate the LMRDA since their union memberships were not threatened. But, unlike the LMRDA, section 8(a) protections are intended to protect the employee-employer relationship. While the LMRDA may be the "source for the protection of a union member's right to participate fully and freely in the internal affairs of his own union," the legality of these discharges must be resolved within the framework of the National Labor Relations Act. *Retail Clerks Union, Local 770,* 208 NLRB 356, 357 (1974). *Accord, NLRB v. Local 212, International Union,* 690 F.2d 82, 85 (6th Cir.1982) (distinguishing *Finnegan* and holding that a union violates 8(b)(1) by re-moving union member from committee for member's exercise of protected right to file unfair labor charge).

The Union also relies on Board authority holding that newly elected union officers may purge old employees and install their own supporters. *E.g., Retail Store Employees, Local 876,* 212 NLRB 113 (1974); *Local 770,* 208 NLRB 356 (1974); *see also Butchers Union Local 115,* 209 NLRB 806 (1974) (upholding right to discharge union employee because of employee's intraunion political aspirations). We believe that the interests at stake here are different than in "patronage" cases. There is no evidence that the discharges were made because Martin or Prescott sought to change the Union's administration. A union may properly value loyalty and cooperation of its employees. *Shenango Inc.,* 237 NLRB 1355, 1355 (1978). But a union does not have the same legitimate interest in shielding itself from allegations of illegal conduct made by members. The Board recognized that public policy considerations dictate that employees be afforded full and unimpeded access to governmental agencies to voice their concerns. *Carpenters Local Union 35,* 264 NLRB 795, 797 (1982) (citing cases). The policy is hindered by allowing a union to discharge employees who raise good faith concerns.

■ The Board has the responsibility to determine in the first instance the "boundaries" of section 7. *Eastex, Inc. v. NLRB,* 437 U.S. 556, 568, 98 S.Ct. 2505, 2513, 57 L.Ed.2d 428 (1978). The Board's special competence in this field justifies that deference be accorded that determination. *NLRB v. Weingarten, Inc.,* 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975). In *Weingarten,* the Court upheld the Board's choice because "the Board has reached a fair and reasoned balance upon a question within its special competence, its newly arrived at construction of § 7 does not exceed the reach of that section, and the Board has adequately explicated the basis of its interpretation." *Id.* at 267, 95 S.Ct. at 968; *see also NLRB v. City Disposal Systems, Inc.,* — U.S. —, 104

**484**

S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984) (reaffirming Board's role of defining the scope of section 7 and giving considerable deference to its decision).

■ Similarly, the Board here reached a fair and reasoned balance. Admittedly, the activities sought to be protected are only incidentally related to the employee's union status. Martin and Prescott sought to correct what they believed to be violations of election procedures and misuse of funds. The interest protected was not their own but the integrity of their bargaining representative. The Board's interpretation of section 7 to reach the activities here cannot be said to be unreasonable. The interests sought to be protected are defensible under the Act, and accordingly, the Board's interpretation is entitled to deference.

## CONCLUSION

■ There is sufficient evidence in the record to support the Board findings on the cause of Martin's and Prescott's discharges. The Board properly applied the law. Accordingly, the Board's order will be enforced as modified to reflect Martin's settlement.

ENFORCED.